EL PUEBLO DE PUERTO RICO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE BAYAMÓN, HON. EDWIN MELÉNDEZ GRILLASCA, JUEZ, demandado; ISRAEL RIVERA PÉREZ, interventor.

*Número:* O-75-296        *Resuelto:* 18 de febrero de 1976

*Miriam Naveira de Rodón, Procuradora General,* y *Américo Serra, Procurador General Auxiliar,* abogados del peticionario; *Benigno Alicea Alicea,* abogado del interventor.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

El interventor adicto Israel Rivera fue convicto de dos cargos de posesión y transportación de heroína bajo la anterior Ley de Narcóticos y sentenciado el 4 de agosto de 1970 a penas de presidio de 8 a 12 años en un caso y de 8 a 10 en el otro, a cumplirse *consecutivamente.* La sentencia le fue suspendida bajo el régimen probatorio dispuesto en 34 L.P.R.A. sec. 1026 y ss. Subsiguientemente se libró del vicio, estudió contabilidad, contrajo matrimonio y al presente es un ciudadano ejemplar. En 2 de diciembre de 1974 solicitó de la sala

de instancia modificación de la sentencia por hallarse comple-tamente rehabilitado y el juez declaró nula la sentencia por considerar sus términos excesivos y señaló fecha para resen-tenciar a tenor de la vigente Ley de Sustancias Controladas (24 L.P.R.A. sec. 2101 y ss.). Al *certiorari* de El Pueblo aduciendo falta de jurisdicción en el tribunal de instancia para rebajar la sentencia por haber transcurrido el término de 90 días desde que fue dictada (Regla 185 de Procedimiento Criminal), libramos orden requiriendo del acusado interventor que muestre causa por la que no deba anularse la resolución de instancia, mas una ulterior consideración del caso nos inclina a sostener al juez recurrido.

■ Este Tribunal no ha de detenerse ante una interpreta-ción literal de reglas para corregir un castigo a todas luces desproporcionado y exagerado. La individuación de la pena y la expresada tendencia legislativa a considerar al adicto como enfermo curable no toleran este castigo que excede el impuesto a reos cuya deformación y tipo de con-ducta antisocial los excluyen de los beneficios de la liber-tad a prueba.

■ Si nuestro sistema de libertad a prueba (34 L.P.R.A. sec. 1026 y ss.) faculta al tribunal para "suspender los efectos de la sentencia" y a la vez dispone que el convicto "quedará bajo la custodia legal del tribunal", siendo el más relevante efecto de la sentencia la duración del término de reclusión impuesto, no vemos impedimento para que en un caso adecuado como el presente pueda el juez en su amplia supervisión de la libertad del probando, modificar el término original de la sentencia cuando a su juicio resultare ser condición impropia e innecesaria a los fines de rehabilita-ción que es el propósito central del sistema. Es la compen-sación de la facultad que autoriza al mismo tribunal a encar-celar al convicto si infringe los términos y condiciones de su probatoria.

La Ley de Sustancias Controladas de 1971 (24 L.P.R.A. sec. 2101 y ss.) implantó una política pública para enfrentar la adicción a drogas narcóticas enfilada hacia el rescate del adicto como opción preferente a su encarcelamiento. Refleja el nuevo estatuto la conciencia social y científica de que el presidio no cura la adicción a drogas, como en el pasado tampoco sirvió para curar la adicción alcohólica. En armonía con la corriente rehabilitadora este Tribunal en *Martínez Reyes* v. *Tribunal Superior*, 104 D.P.R. 470 (1975), eliminó las convicciones bajo la anterior Ley de Narcóticos como impedimento descalificante para una suspensión de sentencia en subsiguiente convicción por infringir la Ley de Sustancias Controladas.

Bajo el propósito legislativo de reformar al adicto, el término de prisión, pena suspendida cuando se pone al convicto bajo un régimen de libertad a prueba, pierde su virtualidad de castigo por reclusión y se convierte en una condición del régimen. Como tal condición estará vinculada a la conducta del probando. Los hechos de este caso demuestran que una pena desusadamente larga, especialmente las impuestas bajo la anterior ley, puede exceder en mucho el término necesario para la rehabilitación del convicto y en tal caso resulta inútil mantenerla hasta su extinción.[1] El principio de individuación de la pena se cumple en tales casos modificando la original y resentenciando al probando a una pena que se ajuste a la vital realidad de su reforma y a la política pública que encarna la Ley de Sustancias Controladas de 1971 (24 L.P.R.A. sec. 2101 y ss.).

---

[1] Al reconocer en los tribunales esta facultad estimativa, base para modificación de la pena en cualquier tiempo para atemperarla al progreso de la rehabilitación del convicto en probatoria, sólo seguimos la pauta marcada por el legislador que faculta a la Administración de Corrección creada por Ley Núm. 116 de 22 de julio de 1974 para participar en toda decisión en cuanto a recomendaciones para dar por terminado el confinamiento, el período de libertad bajo palabra o el término de libertad a prueba o para modificar las condiciones o términos de ésta. Título III, Art. 7(f)(3) ley citada.

■ La Regla 185 de Procedimiento Criminal(²) interpretada en *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 539 (1964), no impide la modificación de la sentencia en este caso. Su empuje está principalmente dirigido a situaciones en que la reclusión del convicto en un establecimiento de corrección es recurso imperativo de defensa social. En lo que respecta al tratamiento judicial de la adicción a drogas la rebaja de sentencia en probatoria no ha de considerarse como intervención con el criterio original del juez que la impuso, sino como reajuste y adaptación al propósito legislativo vigente en el nuevo estatuto; como la modificación de cualquier otra condición impuesta al probando según evoluciona su conducta bajo las normas de libertad a prueba.

■ Preservando para el tribunal de instancia facultad continua para reducir los términos de la sentencia exclusivamente en casos en los que la Ley de Sustancias Controladas concede la alternativa de libertad bajo régimen probatorio, nos guiamos por el propósito legislativo delineado en su Art. 522 (24 L.P.R.A. sec. 2522) que una vez certificado el adicto como rehabilitado por la agencia correspondiente, lo declara elegible para libertad bajo palabra dispensándolo del usual requisito de haber cumplido el mínimo de la sentencia; el Art. 516 que faculta al Secretario a relevar cualquier convicto rehabilitado de la prohibición allí impuesta relativa a licencia de conducir y de posesión o portación de armas de fuego por término de cinco años a partir de la extinción de la sentencia o de haber sido declarado adicto; el Art. 404 (24 L.P.R.A. sec. 2404) que

---

(²) Regla 185 de Procedimiento Criminal

". . . El Tribunal sentenciador podrá corregir una sentencia ilegal en cualquier momento. Asimismo podrá por causa justificada y en bien de la justicia, rebajar una sentencia dentro de los noventa días de haber sido dictada, siempre que la misma no estuviere pendiente en apelación, o dentro de los sesenta días después de haberse recibido el mandato confirmando la sentencia o desestimando la apelación o de haberse recibido una orden denegando una solicitud de *certiorari*."

extiende al convicto de posesión la libertad a prueba por término que no exceda de cinco años, suspendiéndose el procedimiento sin hacer pronunciamiento de culpabilidad, disponiendo exoneración y sobreseimiento sin declaración de culpabilidad si el probando cumple las condiciones del régimen; el Art. 602 (24 L.P.R.A. sec. 2602) que manda aplicar las penas menores del nuevo estatuto a casos similares surgidos bajo la ley anterior; y las disposiciones transitorias de dicha Ley de Sustancias Controladas (Núm. 4 de 23 de junio de 1971) que proveen para toda persona convicta de posesión la suspensión de procedimiento criminal y las penalidades menores de los incisos (b) y (a) respectivamente del Art. 404 (24 L.P.R.A. sec. 2404) "aun cuando la acusación, en su caso, hubiese sido radicada al amparo de legislación anterior." Responde todo este esquema legislado a la naturaleza de la infracción en que incurre el adicto a drogas cuya aflicción no tiene carácter intrínsecamente criminoso y en que la carga del agravio se concentra principalmente en el individuo afectado. El tratamiento especial que los casos de posesión de drogas reciben en la Ley, demanda un método correctivo apropiado en armonía con el propósito de la ley, diferenciable del seguido con otros delitos.

No estamos preconizando la rebaja automática e indistinta de sentencias suspendidas bajo régimen probatorio en casos bajo la Ley de Sustancias Controladas. La discreción del juez ha de moverse con criterios selectivos en circunstancias que apelen a su sentido básico de justicia ante los méritos del caso, y a la luz de los principios de individuación de la pena y reforma del adicto aquí enunciados.

■ Por ser el término de una sentencia su principal efecto y condición sujeto a suspensión bajo la Ley de Libertad a Prueba (34 L.P.R.A. sec. 1026 y ss.) y hallándose el probando bajo la custodia legal del tribunal, éste tiene poder en cualquier tiempo para modificar la duración de dicho término atemperándolo al grado o etapa de rehabilitación del

sentenciado, como lo tiene para modificar cualquier otra condición de la libertad en probatoria.

*No ha lugar al certiorari del Estado para revisar la resolución recurrida. Confirmada.*

El Juez Asociado Señor Rigau disintió con opinión separada. El Juez Asociado Señor Martín emitió opinión disidente en la cual concurren los Jueces Asociados Señores Rigau y Torres Rigual. El Juez Asociado Señor Irizarry Yunqué radicará una expresión particular.

—O—

Opinión disidente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 18 de febrero de 1976

Este asunto de las drogas prohibidas me ha preocupado por varios años y ha ido creciendo en mí la insatisfacción con la forma en que en nuestra sociedad hemos venido tratando el mismo. De más está decir que por ser éste un problema tan complejo y de tan difícil trato hay que acercarse a él con suma humildad y con total honradez intelectual.

Digo trato y no solución pues solución total y definitiva para un problema de esta naturaleza es, por lo menos por ahora, sólo un sueño. Sin embargo, creo que el problema puede reducirse a proporciones manejables y tolerables. Expongo las ideas que siguen con la esperanza de que puedan ser útiles— aún para ser rechazadas y sustituidas por otras mejores— cuando se haga una reforma de nuestro Derecho sobre el particular.

El caso de autos es un ejemplo de lo inadecuado que es el tratamiento que venimos dando por varios años y durante distintas Administraciones a este problema de las drogas prohibidas. Israel Rivera, el antes acusado y aquí interventor, es descrito hoy día como un ciudadano ejemplar, marido modelo y persona que da de su tiempo y de sus energías a causas cívicas y humanitarias. Sin embargo, por haber sido adicto pesan sobre

su vida dos sentencias para ser cumplidas consecutivamente, una de 8 a 12 años de presidio y otra de 8 a 10, lo que significa que ambas constituyen una sentencia de 16 a 22 años de presidio.

La principal dificultad que existe hoy día para tratar este asunto de las drogas, no consiste en sus problemas técnicos, médicos y económicos, sino que consiste en la actitud que frente a él predomina. Me refiero a que se ha hecho del problema un asunto moral. No se admite así, explícitamente, pero creo que se piensa que es inmoral usar marihuana y drogas, y naturalmente, como lo inmoral indigna, tan pronto se toca el tema surge la indignación. Al ésta invadir el campo queda anulada, o reducida a un mínimo ineficiente, la función racional e intelectual.

Si logramos que, aunque sea temporeramente en lo que discutimos el problema, se deje a un lado la indignación, entonces creo que podremos desatar este nudo gordiano sin la espada. Máxime cuando la experiencia ha demostrado que la espada no ha tenido éxito, pues como las entrañas de Prometeo, el nudo se ha vuelto a formar apenas dado el tajo—si se me permite utilizar un símil dentro de otro.

Un distinguido filósofo norteamericano, cuya preocupación intelectual mayor fue la Etica y la teoría de los valores, escribió lo siguiente:

"Felizmente, el que el hombre deba su dignidad a la posesión de la libertad es cosa que apenas requiere argumentación. Su dignidad puede ser poca, mucha o ninguna; pero cualquiera que tenga o que pudiera tener reside en la capacidad del individuo para decidir por sí mismo." [1]

Es en ese espíritu, el de la honesta libertad de pensa-

---

[1] Ralph Barton Perry. Fue profesor de Filosofía de la Universidad de Harvard. Escribió *Present Conflict of Ideals* (1918); *General Theory of Value* (1926) y *Approach to Philosophy* (1905), entre otras obras. El párrafo citado aparece en *The Meaning of the Humanities*, Princeton Univ. Press (1940), pág. 3.

miento, en el que me dirijo al lector y en el cual lo invito a considerar lo que aquí se dice.

En primer lugar voy a exponer sucintamente las razones por las cuales estimo que la actual legislación sobre drogas prohibidas debe ser sustituida por otra. Después propondré un sistema o trato que creo que debemos considerar y quizás ensayar.

1. *La primera razón y la de más importancia práctica consiste en que la legislación actual sobre drogas prohibidas causa males peores que el mal que trata de curar*. Incrementa el peso de esta primera razón el hecho de que la legislación actual, como la experiencia ha demostrado, a pesar de los males que causa, ni siquiera cura aquel contra el cual va dirigida. Veamos por qué digo que esa legislación causa males peores que el que trata de erradicar.

Al prohibir absolutamente la venta y uso de las drogas en la forma en que lo hace la ley, se obliga a sus consumidores a comprarla en el mercado negro y se crea así, como consecuencia de la ley, un precio artificialmente alto, altísimo, a esos productos.

Se estima que hoy día un *deck* de heroína vale $10 o más. También se estima que un adicto necesita $100 o más diarios para mantener su vicio. (El precio no es estable y a unos les cuesta más que a otros.) Eso hace que los adictos no puedan sufragar sus necesidades de esa clase con sus ingresos normales, o con los de su familia, y como el vicio crea una compulsión irresistible los adictos se ven obligados a recurrir a formas ilegales para proveerse los medios para la compra de la droga. Como se sabe, dichas formas ilegales son generalmente el escalamiento de hogares y negocios, el hurto y el robo.

Muchas veces al cometer esos crímenes—a veces sin proponérselo—ocurren delitos de sangre y hasta muertes cuando los adictos son sorprendidos al cometerlos.

Aún limitándonos a los delitos contra la propiedad—escalamientos, hurtos, robos—la Policía de Puerto Rico infor-

ma que en el año 1974 se cometieron 66,864 delitos contra la propiedad. Esto, informa la Policía, equivale a un delito de esa naturaleza cada ocho minutos. Estima un alto funcionario de la Policía que el 60% de los delitos que se cometen en Puerto Rico tienen su causa directa o indirecta en este problema de las drogas prohibidas. (²)

Esa incidencia tan elevada en escalamientos, hurtos y robos ha producido en la población no sólo una sensación sino una realidad de inseguridad en sus personas, en sus hogares y en sus negocios. Hay que vivir y trabajar tras rejas, cerrojos y candados. A pesar de todas esas precauciones y de la ingente labor de la Policía sigue cometiéndose un delito de esa clase cada ocho minutos.

No tengo los datos precisos, pues los que hay son meros estimados. Algunos estiman que puede fluctuar entre el 1% y el 2% de la población el número de adictos. Personalmente creo que aún el 1% es un estimado muy alto. Una legislación que le crea al 99 o al 98% de la población inocente, que no usa drogas, los graves daños que le hace sufrir—puñaladas, escalamiento en los hogares, etc.—con el solo propósito de meter a presidio al restante 1 ó 2% porque insiste en utilizar las drogas, no es una buena legislación.

Se informa que en Inglaterra, en donde el adicto puede obtener legalmente su dosis de droga para uso personal a precio razonable, prácticamente no se cometen delitos causados por este problema de las drogas. (³)

Si no fuese porque este asunto, como señalamos antes, se considera emocionalmente, esa legislación, que existe en ale-

---

(²) Entrevista de la Lcda. Ina Aponte de Avilés con el Coronel Héctor M. Lugo, Director de la División de Drogas y Narcóticos de la Policía de Puerto Rico, celebrada en 26 de febrero de 1975.

(³) Schur, *Crimes Without Victims* (1965), pág. 138. Igual ocurre en España en donde la Dirección General de Sanidad lleva un registro de toxicómanos. A éstos se les permite acudir a un médico que les recete la droga. Alvira Martin, *Las Drogas en España*, Revista Arbor, Enero 1975, Madrid.

gado beneficio del 1 ó el 2% de la población pero que perjudica gravemente al 99 ó al 98% de la misma, no podría subsistir en una democracia, pues es inconcebible que la gran mayoría esté dispuesta a pagar conscientemente tan alto precio por tan pequeño y tan dudoso bien.

Añádase a lo anterior el que es muy cuestionable que aún dicha legislación beneficie a los adictos contra quienes va dirigida. Dudamos que una sentencia de presidio sea menos perjudicial para un ser humano que el uso controlado, privado y pacífico de la droga, aunque ésta también le hace daño. También añádase que la población que sufre en su propia carne, en la santidad de sus hogares y en sus propiedades, los crímenes antes mencionados es la parte de la población que es inocente a los ojos de la ley de drogas porque no las utiliza.

Lo más increíble de todo ésto es que habiéndose cometido antes un error casi idéntico, lo estamos repitiendo apenas medio siglo después. Me refiero a la prohibición del licor, conocida popularmente como "la prohibición."

Durante el primer tercio de este siglo y obedeciendo a un sentir religioso y moral, en los Estados Unidos se prohibió el licor. Una "moral" mayoritaria protestante le impuso esa medida en aquél país a una minoría católica que no participaba de ese punto de vista. Digo esto sin ninguna clase de *animus* y meramente como un dato histórico innegable. Hasta se enmendó la Constitución de los Estados Unidos para ese fin. Como se sabe, el experimento resultó en un fracaso. Hubo que volver a enmendar la Constitución para, mediante la enmienda 21, derogar la número 18.

Contrario a lo que los partidarios de la prohibición vaticinaban, cuando ésta se abolió no se vino abajo el país. La mayoría de la población usa el licor socialmente y siempre, ahora como antes, hay un pequeño porcentaje de adictos llamados alcohólicos que *ahora* reconocemos que son enfermos y no criminales.

No se logró con la prohibición erradicar el uso del licor pero en cambio se causó mucha violencia, mucha tragedia y mucho sufrimiento. Además—igual que ahora con la prohibición de la droga—se creó el gansterismo, el contrabando de la bebida y una ola de criminalidad como jamás la habían conocido los Estados Unidos. (4) En Puerto Rico podemos decir igual: la prohibición absoluta de las drogas ha producido el más numeroso bajo mundo y la mayor incidencia de criminalidad que jamás se habían conocido en este país.

2. La segunda razón la acabamos de mencionar. *La prohibición total de la droga creó el bajo mundo que opera dicha industria* y además la subsidia al mantener, sin proponérselo, un precio irrazonablemente alto para dicho producto. En adición, al hacer en esa forma tan lucrativo dicho negocio, creó también los *pushers* quienes se dedican a inducir a los niños de escuela a usar la droga para luego tenerlos de clientes cautivos. Más adelante explico cómo se podrían hacer desaparecer de nuestro medio ese bajo mundo y también los *pushers*, sin disparar un tiro, sin efectuar un arresto, sin un largo y costoso proceso judicial y sin mantener a nadie en el presidio.

3. Se explica que se castiga al adicto porque la droga le hace daño. Como hemos antes mencionado, *es rara esta forma de "proteger" a una persona de algo que le hace daño: infligiéndole un castigo peor—el presidio*. De todas maneras, examinemos el problema con un poco de más detenimiento. El tabaco y el alcohol también hacen daño. ¿Por qué no metemos en la cárcel a los que fuman tabaco y a los que toman alcohol? Hoy día, meramente con formular la pregunta se ve lo absurdo de la cuestión. Estoy seguro de que en el futuro se considerará casi increíble lo que hoy hacemos con esto de la droga.

4. *El costo social y moral del presente sistema es incalculable.* Nos inquieta la conciencia el que para "proteger"

---

(4) Swisher, *American Constitutional Development* (1943) pág. 704, *ab initio.*

a un pequeño número de adictos no solamente les infligimos condenas de presidio sino que a la vez estamos llevando la tragedia a sus hogares. Hay allí madres, padres, hermanos, esposos, hijos, a quienes el Estado les lleva incalculables sufrimientos porque un miembro de la familia tiene el vicio de la droga. Me explico.

Como hemos señalado, cuando el adicto tiene que incurrir en los delitos de escalamiento, robo y hurto para poder comprar la droga a precios artificialmente elevados es que se convierte realmente en un criminal. De manera que una familia que tiene la desgracia de tener en su seno a un adicto, como si eso no bastase, el Estado, al hacerle imposible a aquél conseguir legalmente su dosis de droga, lo obliga a delinquir —dada la compulsión que el vicio crea— y entonces lo mete en la cárcel. ¿Han visto ustedes a una madre o a una esposa cuando eso ocurre? Es devastador.

5. *El costo económico del presente sistema también es inmenso.* No creo que hay datos precisos sobre lo que cuesta todo el esfuerzo del Estado para perseguir y castigar el 60% de los crímenes cometidos en Puerto Rico contra la propiedad, porcentaje que se le atribuye directa e indirectamente a la prohibición de las drogas. Baste con recordar el trabajo de policías, fiscales, agentes encubiertos, confidentes, jueces, mantenimiento en cárceles, etc.

¿Qué hacer? Desde luego, criticar cualquier sistema es fácil. Lo difícil es proponer alternativas. Siempre he creído que la crítica responsable es la que ofrece alternativas o maneras sustitutas de aquellas que se critican. Voy a proponer una forma en que creo que debíamos atender este problema de las drogas. No soy un experto en el asunto ni pretendo serlo. Tampoco pretendo que mi propuesta sea ni la única ni la mejor. Solamente puedo esperar que se considere, pero si se encuentra una forma superior de atender este problema yo sería el primero en alegrarme.

También quiero decir que no estamos obligados a sostener perpetuamente ninguna forma que se ensaye si ésta no resulta. De todas maneras, el sistema actual no es satisfactorio. Nada se pierde con tratar otras maneras, recordando que siempre podemos desecharlas si no resultan adecuadas.

Como se sabe, nuestra ley es una adaptación de la ley federal. Hablamos mucho de crear nuestro propio Derecho. Creo que este asunto nos ofrece una brillante oportunidad para ello. Nos vienen a la memoria las palabras de Pericles, cuando en su oración en honor de los atenienses caídos en la Guerra del Peloponeso dijo "Nuestra forma de gobierno no emula las leyes de las ciudades vecinas; antes es modelo y no copia de las demás."

Estimo que se podría sustituir la ley actual y se podría abrir, digamos, en el Departamento de Salud, un Registro de Adictos. Salud sería un departamento apropiado tanto por la afinidad del tema como porque tiene oficinas o dependencias en prácticamente toda la isla. Claro, podría ser en cualquier otro Departamento que tenga oficinas por la isla.

La ley autorizaría a los médicos a dar la orden escrita para que las farmacias vendiesen a los adictos la dosis para consumo estrictamente personal. Si se quiere obviar ese paso se podría autorizar a las farmacias a despachar dosis por adicto, previamente calculadas y establecidas en un Reglamento. Mediante ese control el adicto podría comprar el producto a un precio razonable, posiblemente fijado por el Estado, el cual podría ser quizás $1.00 en vez de $10 o mayor, como lo es en el mercado de contrabando.

Esas pequeñas cantidades serían para el uso personal del adicto y evitarían el tráfico ilegal. El que poseyese cantidades grandes, obviamente para fines de venta, sería reo de delito grave. Pudiendo el adicto adquirir a un precio bajo la dosis que necesita para su uso personal no veo el incentivo para que corra el riesgo del presidio comprando a precios más altos

cantidades mayores. También los médicos o farmacéuticos que violasen la ley estarían sujetos a sanción.

Con un plan así, o parecido, creo que se conseguirían los siguientes objetivos: (a) Se reducirían a un mínimo los escalamientos de hogares y negocios, los robos y los hurtos. ¡Se reducirían en aproximadamente 60 % los delitos contra la propiedad en Puerto Rico! (b) Al no tener razón para existir se desvanecería el bajo mundo que opera hoy la industria de la droga en Puerto Rico. La reducción en los asesinatos sería sorprendente. (c) Se desaparecería el *pusher* que induce a los niños de escuela a usar la droga.

El plan que propongo tiene alguna semejanza con lo que se ha hecho en Inglaterra y en otros sitios. Presumo que se dirá que esto no ha resuelto el problema ni en Inglaterra ni en otros lugares. Lo primero que hay que reconocer, como dijimos antes, es que el problema no se va a resolver totalmente. Pero se puede reducir a proporciones en que deje de ser un problema cuantitativamente importante. Eso es a lo más que creo podemos aspirar, pero si se logra ya sería bastante. Sobre todo si recordamos que el sistema actual no ha hecho ni una cosa ni la otra.

Bien vale la pena tratar otras maneras que no le impongan al 99 % de la población que no utiliza la droga las graves penalidades que indirectamente la legislación actual le impone y que a la vez le permita a esa pequeña minoría compuesta de los adictos a vivir sin convertirse en criminales, hasta que la ciencia produzca, si es que lo produce, una cura a ese hábito. Porque existen alcohólicos no le imponemos a los no alcohólicos dichas graves consecuencias, ni tampoco le imponemos a los alcohólicos penalidades de presidio. Creo que hacer lo propio en el caso de los adictos es lo sensato, lo práctico, lo compasivo y lo cristiano.

Sobre este tema hay abundantísima literatura. Me he abstenido de citarla con prolijidad porque creo que lo primordial es aprehender el problema en su más íntima sustancia.

Una vez hecho esto se pueden dar las directrices para la creación de la legislación y del aparato administrativo necesario, el cual debe ser el más sencillo y económico posible. Con problemas más difíciles el hombre se ha confrontado con éxito. No veo por qué no podemos hacerlo en este caso, una vez que sustituyéramos la emoción con la razón. O mejor dicho, una vez que lleguemos a las decisiones mediante la razón, entonces necesitaremos la fuerza de la emoción para llevarlas a cabo.

Repito que la idea que he sugerido es solamente una entre posiblemente varias alternativas. Requeriría ley y un reglamento. De imposible no tiene nada.

Comprendo que por razones prácticas sería deseable que esta reforma fuese bipartita. No deseo subestimar la capacidad de nuestros distinguidos legisladores y administradores para laborar por el bien común. Creo que puede hacerse.

Opinión disidente emitida por el Juez Asociado Señor Martín con la cual concurren los Jueces Asociados Señores Rigau y Torres Rigual.

San Juan, Puerto Rico, a 18 de febrero de 1976

La Ley de Sustancias Controladas de Puerto Rico no contiene disposición alguna que permita resentenciar a un reo convicto bajo la anterior Ley de Drogas luego de expirado el término de 90 días para la reducción de sentencias que establece la Regla 185 de las de Procedimiento Criminal de 1963, aun tratándose de un adicto a drogas cuya sentencia fuera suspendida a tenor con lo dispuesto en la Ley sobre Sentencias Suspendidas. 34 L.P.R.A. sec. 1027.

El aquí interventor, Israel Rivera Pérez, era adicto a la heroína. En 1965 fue ingresado en un hospital en Nueva York donde permaneció recluido por espacio de quince meses, sometido a un tratamiento de rehabilitación. Luego fue paciente

ambulatorio por nueve meses más. No fue curado de su adicción.

En julio de 1969 el Ministerio Público radicó contra el interventor tres acusaciones por violaciones de la referida Ley de Narcóticos. En 4 de agosto de 1970 Rivera Pérez hizo alegación de culpabilidad en cuanto a dos de los cargos, consistentes ambos en posesión, transportación y ocultación de heroína, siéndole archivado el tercero. El tribunal le sentenció a cumplir de 8 a 12 años de presidio en un caso y de 8 a 10 en el otro, a ser cumplidos dichos términos *consecutivamente*. En el acta de sentencia, copia de la cual obra en autos, aparece la siguiente resolución que en el mismo momento dictó el tribunal:

"Se ordena la suspensión de la sentencia a tenor con lo dispuesto en la Ley Núm. 259 de 3 de abril de 1946, sobre Sentencias Suspendidas [34 L.P.R.A. sec. 1027], según ha sido enmendada, quedando el acusado bajo la custodia legal del Tribunal *hasta la expiración del período máximo* de su sentencia, bajo las siguientes condiciones: (Énfasis suplido.)

"EL ACUSADO

1. Respetará los derechos ajenos.

2. Satisfará cualquier reclamación justa que se le haga.

3. No tratará de encubrir sus actividades no ocultándolas al Oficial Probatorio, ni mintiendo acerca de las mismas, ni entorpeciendo cualquier investigación que el Supervisor de la División de Servicios Sociales o el Oficial Probatorio tuvieran a bien hacer acerca de ello.

4. Comparecerá ante el Oficial Probatorio del Tribunal Superior, Sala de Bayamón, el día y a la hora que le sea indicado. Si razones ajenas a su voluntad le impidieran hacerlo, se comunicará con el Oficial Probatorio inmediatamente por escrito exponiéndole los motivos que se lo impidieron y comparecerá en persona en la fecha más cercana a ésta que le fuera posible.

5. Permanecerá constantemente y sin interrupción dentro de la jurisdicción territorial del Tribunal Superior, Sala de Bayamón. *Siempre que tenga necesidad de trasladarse fuera de este límite solicitará el permiso para ello del Oficial Probatorio.* Esta

jurisdicción incluye los siguientes pueblos de la Isla: Bayamón, Cataño, Corozal, Dorado, Guaynabo, Naranjito, Toa Alta, Toa Baja, Vega Alta y Vega Baja. (Énfasis suplido.)

6. Mantendrá al Oficial Probatorio al corriente de toda información que le facilite a él ponerse en contacto con usted lo más rápidamente posible y contestará inmediatamente cualquier informe que reciba del Oficial Probatorio o del Supervisor de la División de Servicios Sociales.

7. Evitará su presencia en bares, sitios donde se lleven a cabo juegos de azar y centros de dudosa reputación.

8. Se le prohíbe terminantemente el uso de bebidas alcohólicas, drogas y otros estupefacientes.

9. Deberá mantenerse empleado y notificará al Oficial Probatorio de todo cambio de empleo o cese en el mismo.

10. Cualquier violación de las leyes vigentes en Puerto Rico conllevará la revocación de esta orden y deberá usted cumplir la sentencia impuesta de acuerdo con la Ley.

11. Por cualquier violación de las condiciones que por la presente se le imponen *o de las que de tiempo en tiempo se le impusieren dentro del régimen a prueba a que se le somete,* la orden de suspensión de los efectos de la sentencia será anulada y el liberado será recluído en prisión donde cumplirá la totalidad de la sentencia impuesta de acuerdo con la Ley. (Énfasis suplido.)

12. Cualquier conducta antisocial o reñida con la moral será suficiente para cancelarle los efectos de suspensión de la sentencia aunque tales actuaciones comprendidas aquí no constituyan violación de una de las leyes vigentes en Puerto Rico.

13. Usted deberá someterse a exámenes médicos, clínicos, psiquiátricos y/o de naturaleza similar que le sean requeridos por el Oficial Probatorio bajo los términos y condiciones que dicho Oficial le indique."

A partir de dicha sentencia, Rivera Pérez cambió radicalmente su forma de vida. Se liberó de su adicción a drogas. Trabajó por siete meses con el programa *Teen Challenge* y luego en un programa de rehabilitación de adolescentes conocido como "Alcance Juvenil". Luego estudió contabilidad en el Metropolitan Junior College de Bayamón. Además de ello, en 1971 ingresó como seminarista en la Iglesia Pentecostal

*Mission Board,* y luego de contraer nupcias continuó perteneciendo a la congregación junto a su esposa. El Pastor lo considera un feligrés ejemplar, y su esposa lo describe como un marido modelo. También predica el evangelio, participa en "cruzadas evangélicas" y se desempeña como maestro escolar dominical. Además de sus labores en la iglesia el interventor actualmente trabaja en una fábrica de gabinetes de cocina. Su conducta es la de un buen ciudadano. Continuaba, por supuesto, hasta el momento de dictarse la resolución objeto del presente recurso, bajo la jurisdicción del tribunal.

El 2 de diciembre de 1974 el interventor radicó ante la Sala que le sentenció una moción que tituló "Sobre Nulidad de Sentencia". Además de lo ya relatado, alegó que encontrándose completamente rehabilitado considera que "los fines de la justicia" se ha logrado por lo que procede: (1) declarar nulas las sentencias antes aludidas" y (2) "dictar sentencia conforme a las circunstancias de los hechos imputados y a la condición del acusado."

En 16 de enero de 1975 el tribunal recurrido emitió una resolución en la que declaró la nulidad de los términos de las sentencias vigentes por considerarlos excesivos, y señaló fecha para resentenciar al interventor a tenor con las disposiciones de la *actual* Ley de Sustancias Controladas, Ley Núm. 4 de 23 de junio de 1971, 24 L.P.R.A. sec. 2101 *et seq.*

El fiscal se opuso a que se resentenciara al interventor alegando en apoyo de su contención que las sentencias habían sido impuestas conforme a la Ley de Narcóticos de 1959, entonces vigente, que las mismas son finales y firmes, que había expirado en exceso el término de 90 días para solicitar la reducción de las sentencias que establece la Regla 185 de las de Procedimiento Criminal de 1963, y que el Art. 4 del nuevo Código Penal de 1974 no es aplicable a la situación de autos conforme lo dispone su Art. 282. En vista de ello, el ministerio fiscal sostuvo que el tribunal de instancia carecía de jurisdicción para resentenciar al interventor.

No obstante la oposición del fiscal el tribunal dictó una resolución en la que afirma tener jurisdicción para resentenciar al interventor bajo las disposiciones del Art. 404 de la actual Ley de Sustancias Controladas, y concedió 30 días al fiscal para que tomara la acción revisoria que estimare menester. El fiscal recurre ante nos por *certiorari* e imputa al tribunal de instancia la comisión de dos errores: (1) al resolver que los términos de las sentencias dictadas en 1970 eran nulos por ser excesivos, y (2) al determinar que tiene jurisdicción para resentenciar al convicto bajo la vigente Ley de Sustancias Controladas, aprobada en 1971.

Dictamos una resolución dirigida al acusado Israel Rivera Pérez para que mostrara causa por la cual no debía revocarse la resolución del tribunal de instancia de 16 de enero de 1975 que decretó la nulidad de la sentencia y anunció que resentenciaría al acusado bajo la nueva Ley de Sustancias Controladas de 1971. Sus argumentos no nos persuaden.

Examinemos antes el segundo señalamiento de error ya que éste plantea la cuestión jurisdiccional. El propio interventor conviene con la Procuradora General que la resentencia debe regirse por la anterior Ley de Drogas y añade que

"La legislación vigente sobre sustancias controladas y la jurisprudencia interpretativa de la misma no nos permiten afirmar, fundamentadamente, que el acto de resentencia deba regirse por las disposiciones del artículo 404 [de la ley actualmente vigente] . . . . *Figueroa Méndez* v. *Tribunal Superior,* 101 D.P.R. 859 (1974)."

La anterior Ley de Drogas no contiene ninguna disposición que autorice al tribunal sentenciador a resentenciar a reos ya sentenciados. Podría argüirse que bajo una interpretación liberal del Art. 404 de la Ley de Sustancias Controladas el tribunal mantiene jurisdicción para modificar o dejar sin efecto las sentencias suspendidas en aquellos casos en que se demostrare la rehabilitación del reo. 24 L.P.R.A. sec. 2404. Pero dicha ley no se aplica a los reos convictos por violaciones

a la anterior Ley de Drogas, en cuya situación se encuentra el interventor, excepto en los casos en que la acusación estuviere pendiente, o en trámites apelativos, a la fecha en que entró en vigor la Ley de Sustancias Controladas en cuyo caso se aplicarán las penalidades de esta nueva ley. 24 L.P.R.A. sec. 2602(a), *Padilla Figueroa* v. *Tribunal Superior*, 101 D.P.R. 923 (1974); *Figueroa Méndez* v. *Tribunal Superior*, 101 D.P.R. 859 (1974).

Creo firmemente que debía existir un procedimiento en ley que permitiera la evaluación de aquellos que sufren el mal de la adicción a drogas y que se encuentren cumpliendo sentencias suspendidas, a los fines de que los tribunales pudieren modificar o dejar las sentencias sin efecto, en aquellos casos en que los justifique su progreso o curación. Pero, el legislador no ha autorizado a los tribunales a así hacerlo, y especialmente a aquellos convictos por la anterior Ley de Drogas. Si yo fuera legislador estaría de acuerdo con ello, pero siendo una cuestión de política pública incumbe a la Legislatura el sentar la norma al respecto.

Es fácil concluir que el tribunal de instancia carecía de facultad para resentenciar bajo la vigente Ley de Sustancias Controladas a un reo sentenciado bajo la anterior Ley de Drogas. El error fue cometido.

Veamos ahora el primer señalamiento. El interventor se declaró culpable en 1970 de dos infracciones al Art. 29 de la Ley de Narcóticos de 1959 entonces vigente, consistentes en posesión, transportación y ocultación de heroína. El Art. 33 de dicho estatuto establecía para dichas infracciones penas de reclusión no menores de cinco (5) años ni mayores de veinte (20). El interventor fue condenado en la sentencia original a cumplir de 8 a 12 y de 10 a 12 años, en cada uno de los cargos, siendo dichas penas válidas dentro de los límites estatutarios aplicables al momento de dictarse las referidas sentencias. *Pueblo* v. *Hoffman Pérez*, 100 D.P.R. 556 (1972); *Pueblo* v. *Mills*, 96 D.P.R. 637 (1968). El interventor hizo alegación de

culpabilidad y por tanto no apeló de las sentencias dictadas, ni tampoco instó procedimiento alguno de impugnación ni de reducción de las penas conforme lo autoriza la Regla 185 de las de Procedimiento Criminal. El interventor comenzó a cumplir su pena bajo el régimen de sentencias suspendidas que autoriza el Art. 2 de la Ley Núm. 259 de 1946, según ha sido éste posteriormente enmendado. 34 L.P.R.A. sec. 1027.

Reiteradamente nos hemos expresado sobre el alcance de las penas válidamente impuestas. En *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 539 (1964) dijimos:

"[U]na vez que el reo ha comenzado a cumplir una sentencia válida, ésta no puede ser modificada en forma alguna. . . . [Esta] regla cumple bien un fin práctico deseable y no la vamos a alterar. . . . Si el caso de autos tiene méritos, puede solicitarse la clemencia ejecutiva." *Id.*, en págs. 541, 542 y 544.

Nada hay en el texto del precitado Art. 2 de la ley que establece la sentencia probatoria que impida al tribunal sentenciador enmendar de tiempo en tiempo las condiciones de la libertad a prueba del interventor para atemperarlas a la realidad de su comportamiento como ciudadano y su grado de rehabilitación, pero carece el tribunal de instancia de facultad para resentenciar al convicto. El estatuto en cuestión establece con claridad manifiesta que el reo continúa bajo la *custodia* del tribunal en los casos en que se encuentra cumpliendo su sentencia en probatoria, por lo que en su discreción y conforme lo ameriten las circunstancias de buen comportamiento del convicto puede el tribunal revisar las condiciones contenidas en la sentencia cuyos efectos fueren suspendidos. Esta situación es distinta a la del reo que se encuentra extinguiendo una condena en una institución penal bajo la custodia del Poder Ejecutivo. *Pueblo* v. *Tribunal Superior*, supra, en págs. 542–3.

Por las razones expuestas expediría el auto solicitado y revocaría la resolución del tribunal recurrido que anula las sentencias impuestas al interventor Israel Rivera Pérez en 5 de octubre de 1970; lo que dejaría dichas sentencias originales

en toda su fuerza y vigor, sin perjuicio de que el tribunal de instancia pudiere revisar de tiempo en tiempo, en su discreción las condiciones impuestas al interventor, según lo ameritaren las circunstancias.

—o—

Voto particular emitido por el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 18 de febrero de 1976

Suscribo en todas sus partes la opinión mayoritaria, a la cual uno mi voto, por considerar que, apartándose de la rigidez interpretativa, encauza el propósito rehabilitador de la Ley de Sustancias Controladas por un sendero práctico, recto y sin meandros.

Salvando tecnicismos impide la injusticia que significaría para el interventor continuar bajo el peso de sentencias consecutivas mínimas de ocho años de prisión cada una, estando ya totalmente rehabilitado. Logrado ya el propósito rehabilitador de la Ley, también se logró el propósito de la sentencia, y mantener su vigencia como fue originalmente impuesta constituye un castigo cruel e inusitado contrario al Art. II, Sec. 12 de la Constitución.

Me mueve, sin embargo, a consignar este voto particular, la ponencia franca y orientadora del hermano Juez Rigau, con la que concurriría de no estar concebida como un voto disidente. No creo que el análisis del problema de la adicción a drogas y las medidas correctivas que sugiere el Juez Rigau conflijan con los principios de esencial justicia de la opinión mayoritaria, enmarcados en la situación actual de la ley. Creo como el Juez Rigau que la actual Ley de Sustancias Controladas es inadecuada para conjurar el mal que trata de corregir, y que sus efectos indirectos se han traducido en más graves problemas de criminalidad. No estoy preparado para endosar las medidas que sugiere el Juez Rigau, pero bien vale la pena que sean consideradas por las otras ramas de gobierno.